IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

| | | |
|---|---|---|
| **J. R.,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| v. | : | Case No. 5:21-cv-175-CHW |
| | : | |
| **COMMISSIONER OF SOCIAL SECURITY,** | : | Social Security Appeal |
| | : | |
| **Defendant.** | : | |

**ORDER**

This is a review pursuant to 42 U.S.C. § 405(g) of a final decision of the Commissioner of Social Security denying Plaintiff J.R.'s application for disability insurance benefits. The parties consented to have a United States Magistrate Judge conduct proceedings in this case, and as a result, any appeal from this judgment may be taken directly to the Eleventh Circuit Court of Appeals. Because substantial evidence supports the ALJ's credibility ruling, the Commissioner's decision is **AFFIRMED**.

**BACKGROUND**

Plaintiff applied for Title II disability benefits in September 2019, alleging disability beginning in April 2019 due primarily to post-traumatic stress disorder (PTSD) associated with his past service in the Navy from 1988 to 1992. (R. 98). Plaintiff also suffers from obstructive sleep apnea, and the record contains a diagnosis of depressive disorder. (R. 36).

After Plaintiff's application was denied initially and on reconsideration at the state-agency level of review (R. 98–119), Plaintiff requested further review before an administrative law judge (ALJ). The ALJ held a hearing in September 2020, at which Plaintiff testified that he took medical

leave from April to October 2019, and then retired in October 2019, from his post-military work as a state parole officer. (R. 41). Plaintiff's hearing testimony highlighted the demanding and sometimes dangerous nature of this job, and Plaintiff's alleged onset date is based on "an incident at work that triggered his past." (R. 35). On questioning by the ALJ, however, Plaintiff acknowledged that he might be able to adjust to a less challenging occupation:

> Q. Okay. Alright. Now … you did have a, a difficult and dangerous job, and you've retired from that job, [so] you're no longer being asked to serve with the offenders. If you had a security type job where you just watched out for a facility, maybe protected some mainframe computers or something, would you be able to work a security job like that fulltime?
>
> A. I, I know my concentration and stuff is, I probably could. I, I would say yes. I mean —
>
> Q. Mm-hmm, probably could if … you took some of the risk factors out of it?
>
> A. Yes, sir.
>
> (R. 43)

In November 2020, the ALJ issued an unfavorable opinion finding that Plaintiff could perform a modified range of medium work that required only "simple, routine tasks," and only "occasional social interaction in the workplace." (R. 20). In so finding, the ALJ partially discounted Plaintiff's description of his symptoms, and the degree to which those symptoms would impair Plaintiff's functioning. Plaintiff subsequently sought further administrative review before the Appeals Council, who declined to conduct further review. (R. 1-3).

Before this Court, Plaintiff now argues that the ALJ erred by failing to credit Plaintiff's account of his symptoms, and thereby find disability. More precisely, Plaintiff argues that he satisfies, as a matter of law, the applicable "pain standard" that "applies when a claimant attempts to establish disability through his or her own testimony of pain or other subjective symptoms."

*Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991). As discussed below, because substantial evidence supports the ALJ's adverse credibility ruling, the Commissioner's decision is affirmed.

## STANDARD OF REVIEW

Judicial review of a decision of the Commissioner of Social Security is limited to a determination of whether that decision is supported by substantial evidence, as well as whether the Commissioner applied the correct legal standards. *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178 (11th Cir. 2011). "Substantial evidence" is defined as "more than a scintilla," and as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* The Eleventh Circuit has explained that reviewing courts may not decide the facts anew, reweigh the evidence, or substitute their judgment for that of the Commissioner. *Id.* Rather, if the Commissioner's decision is supported by substantial evidence, the decision must be affirmed even if the evidence preponderates against it.

## EVALUATION OF DISABILITY

Social Security claimants are "disabled" if they are unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations outline a five-step sequential evaluation process for determining whether a claimant is disabled: "(1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of impairments; (4) based on a residual functional capacity ("RFC") assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can

perform given the claimant's RFC, age, education, and work experience." *Winschel*, 631 F.3d at 1178 (11th Cir. 2011) (citing 20 C.F.R. §§ 404.1520(a)(4)(i)-(v); 416.920(a)(4)(i)-(v)).

## MEDICAL RECORD

The available medical record shows that Plaintiff received counseling in early 2018 at the Dublin VMAC for depression and PTSD related to disturbing memories of his military service in the Navy from 1988 to 1992. (R. 1145, 1205–07, 1277–79). On the PCL-5 test (post-traumatic disorder check list), Plaintiff consistently registered scores in the 50s out of an 80-point test, indicating that "severe symptoms" were reported. (R. 1256, 1260, 1267, 1271, 1278). In March 2018, Plaintiff additionally sought care for obstructive sleep apnea (R. 1238) and for a strain of the left middle finger (R. 698, 1241) that was found to have no functional impact. (R. 1251). Subsequent PCL-5 tests conducted in 2018 revealed additional scores in the 50s. (R. 1096, 1212). The record indicates that Plaintiff participated in group and individual therapy sessions (R. 1192) and that treating sources experimented with Plaintiff's dosage of medications, which included Trazodone and melatonin for sleep, prazosin for hypertension, and fluoxetine for anxiety and depression. (R. 1160). By August 2018, Plaintiff's insight and judgment both were described as "good," his thought processes were described as "logical," his attitude was noted as "cooperative," but his mood was described as "anxious (highly)." (R. 1142). Contemporaneously, Plaintiff reported feeling "a lot better." (R. 1138).

Records documenting Plaintiff's continued treatment at the Dublin VMAC in early 2019 indicate that treating sources ruled out headaches and chronic fatigue syndrome as disabling diagnoses. (R. 1073, 1077). Plaintiff did receive treatment, though, for his weight — the record shows a BMI of nearly 35 (R. 1058–59) — and for diabetes, a condition that Plaintiff managed with the medications metformin and Onglyza. (R. 1061). At a March 2019 treatment session,

Plaintiff reported that he was "in [a] panic," "overwhelmed and cannot focus on what … he has to do," and that his level of distress was rated at thirty on a one to ten scale due to the difficulty of his work as a parole officer. (R. 973, 989). Plaintiff's medication dosages were increased, although treating sources advised Plaintiff that "[f]our to six weeks is generally needed to see a benefit from these changes." (R. 990). Additionally, in April 2019, Dr. Janice Whitacre, Ph.D., Plaintiff's psychologist, recommended that Plaintiff take family leave from work because Plaintiff's job as a parole officer was overwhelming. (R. 958, 973, 977). Plaintiff was encouraged to exercise, "get out in nature," and enjoy positive outlets like hunting. (R. 957). By late April, Plaintiff reported being "less stressed since being at home." (R. 964).

Continued VA treatment records from 2019 and into 2020 show that Plaintiff's mental status exams consistently produced findings of "good" judgment, a "logical" thought process, a "reality oriented/unremarkable" thought content, and a "cooperative" attitude, although Plaintiff was noted to have an "anxious" mood. (R. 404, 558, 580 746, 754, 790, 804, 831–32, 843, 870, 1470, 1492, 1511, 1571, 1640, 1650). The record shows a diagnosis of "major depression, recurrent, mild." (R. 430). The record also indicates that Plaintiff's report of panic attacks was at least partly attributable to a "high dose [of] modafinil," (R. 430), a stimulant used to combat Plaintiff's daytime drowsiness resulting from sleep apnea. (R. 429). Upon the discovery of this medication side effect, Plaintiff's modafinil prescription was cancelled. (R. 420).

During this period, the record contains a June 2019 PTSD evaluation form completed by Dr. Daniel Kirschenbaum, Ph.D., a psychologist. Dr. Kirschenbaum indicated that Plaintiff's PTSD would cause both occupational and social impairments in broad areas of functioning including "work, school, family relations, judgment, thinking and/or mood." (R. 1719). Dr. Kirschenbaum also indicated that Plaintiff would have "marked physiological reactions to internal

5

or external cues" (R. 1721), as evidenced by Plaintiff's "explosive fight with a prisoner at work recently" while Plaintiff was still employed as a parole officer. (R. 1720, 1724).

Plaintiff also continued to treat at the Dublin VMAC for sleep apnea. On testing, Plaintiff scored an apnea hypotony index rating of 23.4, which was indicative of moderate sleep apnea. (R. 708). Treatment records indicate that Plaintiff sometimes reported getting inadequate amounts of sleep, *see* (R. 1765) ("only 1 to 1.5 hours"), due possibly to his treatment with Pamelor, an antidepressant. (R. 1765). At other times, Plaintiff reported that he was "sleeping too much," which may have been a product of his treatment with Trazodone, a different antidepressant. (R. 907). Treating sources cancelled Plaintiff's Pamelor prescription (R. 1738), began the process of "wean[ing] off the [T]razodone," (R. 1320, 1768, 1740), and encouraged Plaintiff to take up to 6 mg of melatonin as needed. (R. 411). Several records indicate that Plaintiff "doesn't want to sleep too deeply so that he can be on alert" (R. 1384) or that Plaintiff "[a]verages 3-4 hours" of nightly sleep and "does not want to sleep more than this." (R. 1556).

## DISABILITY EVALUATION IN PLAINTIFF'S CASE

Following the five-step sequential evaluation procedure, the reviewing ALJ made the following findings in Plaintiff's case. At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since at least April 22, 2019, his alleged onset date. (R. 18). At step two, the ALJ found that Plaintiff had the following severe impairments: "hypertension; obesity; obstructive sleep apnea; diabetes mellitus; mild osteoarthritis; post-traumatic stress disorder ("PTSD"); mood disorder; personality disorder; [and] anxiety disorder." (R. 18).

At step three, the ALJ found that Plaintiff's impairments did not meet or equal any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 18). Therefore, the ALJ assessed Plaintiff's RFC and found that Plaintiff could perform medium work, with the

modification that Plaintiff be limited to "simple, routine tasks" and only "occasional social interaction in the workplace." (R. 20).

Based on this RFC, the ALJ determined at step four that Plaintiff was unable to perform his past relevant work as a correctional officer or security guard. (R. 24). At step five, however, the ALJ determined that Plaintiff could adjust to the requirements of other work, including the representative occupations of packer/hand packager, kitchen helper/dishwasher, industrial cleaner, and poultry dresser. (R. 25–26). Accordingly, based on this step-five finding, the ALJ concluded that Plaintiff was not disabled within the meaning of the Social Security Act.

## ANALYSIS

Before this Court, Plaintiff argues that the ALJ erred by not crediting Plaintiff's description of the symptoms and limitations flowing from his psychological diagnoses, primarily PTSD along with associated sleep apnea. More precisely, Plaintiff argues that he qualifies for disability because he satisfies the *Holt* pain standard. *See Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991). That pain standard requires a showing of:

> (1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain.
>
> *Holt*, 921 F.2d at 1223

Plaintiff plainly satisfies the first prong of this inquiry, but the ALJ concluded that Plaintiff did not satisfy the standard's second or third prongs. (R. 21–22). In reviewing the ALJ's conclusion, this Court is mindful that "[c]redibility determinations are the province of the ALJ." *Wilson v. Comm'r*, 500 F. App'x 857, 859 (11th Cir. 2012). *See also Biestek v. Berryhill*, 139 S.Ct. 1148, 1157 (2019) (observing that the substantial evidence standard "defers to the presiding ALJ, who

has seen the hearing up close"). For the following four reasons, the ALJ did not err either in his *Holt* pain standard analysis or in his correlative review of the medical record.

First, the ALJ did not err by crediting the findings of numerous mental status examinations conducted by a variety of medical sources at the Dublin VAMC, including Dr. Lois Jane Macdonnell, M.D., a psychiatrist, *see, e.g.*, (R. 790), and Dr. Janice Whitacre, Ph.D., a psychologist. *See, e.g.*, (R. 831–32). Although these sources observed that Plaintiff had an anxious mood, they consistently found that Plaintiff had good judgment and insight, a logical thought process, a cooperative attitude, and unremarkable thought content. (R. 404, 558, 580 746, 754, 790, 804, 831–32, 843, 870, 1142, 1470, 1492, 1511, 1571, 1640, 1650). As explained by the ALJ in the "Paragraph B" component[1] of her analysis, the consistency of these findings, which date from a period of late 2018 through 2020, strongly suggests that Plaintiff's PTSD and mild depressive disorder did not result in marked limitations in Plaintiff's ability to concentrate, interact with others, understand and apply information, or self-manage. (R. 19–20).

Second, the record supports the ALJ's conclusion that Plaintiff had "seen improvement in his symptoms with therapy and medications." (R. 22). The record indicates that Plaintiff's medications may, in some instances, have created problems though side effects. For example, the record indicates that Plaintiff's treatment with Trazodone, an antidepressant, caused Plaintiff to "sleep[] too much." (R. 907). Conversely, the record indicates that Plaintiff's treatment with modafinil, a stimulant, may have induced or exacerbated Plaintiff's anxiety or panic attacks. (R. 430). In both cases, treating sources weaned Plaintiff off the medications and encouraged Plaintiff to continue to take other medications such as fluoxetine and melatonin. The record

---

[1] Within the mental disorder listings, the Paragraph B criteria describe "a set of impairment-related functional limitations." *Stone v. Comm'r*, 586 F. App'x 505, 512 (11th Cir. 2014).

supports the ALJ's findings that these other medications helped Plaintiff to "feel[] a lot better." (R. 1138) (internal quotation marks omitted).

Third, the ALJ provided an accurate narrative of Plaintiff's work and treatment history, both of which were affected by an April 2019 incident that occurred while Plaintiff was employed as a state parole officer. The incident — I which Plaintiff had to wrestle a parolee "to get cuffs on," and "on [the] way to jail [the] offender was [still] fighting" (R. 864, 867) — induced Plaintiff to take medical leave and eventually to retire, and contemporaneous treatment notes indicate that Plaintiff felt "overwhelmed" both by the dangers of his job and by the stress of the demanding hours required. *See* (R. 989) ("he is working 60 to 80 hours a week"). Yet the ALJ was correct to note that Plaintiff's mental status examinations, discussed above, remained "largely unremarkable" during this period. (R. 21). It was not unreasonable of the ALJ to observe that while Plaintiff might have suffered a temporary psychological decline in the wake of his April 2019 encounter, disabling conditions in the social security context "must last, or be expected to last, at least twelve months." (R. 23). The June 2019 PTSD evaluation provided by Dr. Daniel Kirschenbaum, therefore, offers a poor baseline for Plaintiff's psychological functioning, since the opinion was provided shortly after Plaintiff was involved in an "explosive fight with a prisoner at work."[2] (R. 1724). The critical inquiry for this case, as observed by the ALJ during Plaintiff's administrative hearing, is whether Plaintiff is able to perform any work, particularly work with "some of the risk factors out of it." (R. 43).

Fourth and finally, the record supports the ALJ's conclusion that Plaintiff's "statements about the intensity, persistence, and limiting effects of his symptoms [were] inconsistent with the

---

[2] The ALJ also found Dr. Kirschenbaum's opinion to be "vague" (R. 23), in that Dr. Kirschenbaum's checkbox-evaluation offers little specific guidance on the degree to which Plaintiff would suffer from "distress or impairment in social, occupational, or other important areas of functioning." (R. 1722).

9

medical and other evidence," including both Plaintiff's course of treatment and his activities of daily living. (R. 21). Plaintiff's course of treatment and activities included group and individual therapy sessions, but Plaintiff also was advised to watch mindfulness meditation YouTube videos (R. 868), to get exercise, which Plaintiff accomplished through daily gym visits (R. 1431), and to spend time outdoors, which Plaintiff accomplished by hunting with others. (R. 957). The record additionally indicates that Plaintiff considered enrolling in free university-level classes in his spare time. (R. 1321). The ALJ committed no error by considering, as one factor in his analysis, these activities, which are not indicative of disability. *See* 20 C.F.R. § 404.1529(3) ("Consideration of other evidence").

In summary, substantial evidence supports the ALJ's decision partially to discount Plaintiff's report of the degree to which his psychological symptoms would limit his functional capacity. Accordingly, because substantial evidence supports the Commissioner's decision, that decision must be affirmed.

## CONCLUSION

After a careful review of the record, and for the reasons discussed herein, the Commissioner's final decision in Plaintiff's case is **AFFIRMED**.

**SO ORDERED**, this 21st day of September, 2022.

s/ Charles H. Weigle\
Charles H. Weigle\
United States Magistrate Judge